**In re GYNCOR, INC., d/b/a The Center for Human Reproduction, a Delaware Corporation, et al., Debtors.**

**Gyncor, Inc., The Center for Human Reproduction—Illinois, M.D., S.C. and The Medical Office for Human Reproduction—New York, P.C., Plaintiffs,**

**v.**

**Healthshield Capital Corporation, f/k/a CMI Capital Corporation and Gersten, Savage & Kaplowitz, LLP, Defendants.**

Bankruptcy Nos. 99 B 19175 to
99 B 19177, 99 B 22207.
Adversary No. 00 A 00025.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 27, 2000.

Steven Towbin, D'Ancona & Pflaum, Chicago, IL, for Gyncor, Inc. and The Medical Office for Human Reproduction.

Robert M. Fishman, Shaw Guissis Domanskis Fishman & Glantz, Chicago, IL, for Defendants.

Timothy French, Neal Gerber & Eisenberg, Chicago, IL, for AIG–IL, AIG–NY and Dr. Gleicher, Plaintiffs.

Pam Hollis, Hollis & Johnson, Chicago, IL, for Capital Health Care, Plaintiff.

## MEMORANDUM OPINION

JOHN D. SCHWARTZ, Bankruptcy Judge.

This matter is before the court on the motion to dismiss ("Motion") of Healthshield Capital Corporation ("Healthshield") and Gersten, Savage & Kaplowitz, LLP. ("Gersten Savage") (collectively "Defendants") seeking dismissal of the two count complaint ("Complaint") filed January 12, 2000, by Gyncor, The Center for Human Reproduction—Illinois, M.D., S.C. and The Medical Office of Human Reproduction—New York, P.C. (collectively "Plaintiffs").[1] The Defendants are seeking dismissal of the Complaint under Fed. R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction or alternatively, under Fed.

R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.[2] The Complaint seeks injunctive relief for violations of the automatic stay, 11 U.S.C. § 362, (Count I) and for damages resulting from a violation of the automatic stay and for the breach of a financing commitment ("Commitment") which would have provided funding for the purchase of the Debtor's assets (Count II). (The Commitment is attached as Appendix A.) After reviewing the Complaint, the parties' briefs, and the relevant case law, the court will grant the Motion.

## BACKGROUND

On June 16, 1999, the Debtor entities filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code ("Code").[3] The Debtors are two reproductive practices, one in Chicago and one in New York City, which filed for bankruptcy protection together with the management company which performed the administrative functions for the two practices in question, in addition to other practices. Collectively, they will be referred to as the Debtor. A third, related practice filed for bankruptcy in July and is not involved in the present proceedings. There were other affiliated practices but they have not filed for bankruptcy protection.

No trustee was appointed and, pursuant to § 1107, the Debtor continued to operate in the ordinary course of business.[4] In the course of operations, the Debtor determined that it had no realistic prospect of reorganizing and had to either sell the business on a going concern basis or liquidate its assets. On November 9, 1999, the Debtor made application to the court and, after a hearing, the Debtor was authorized

---

1. The Motion to Dismiss was filed July 13, 2000, *nunc pro tunc* March 16, 2000. After a review of the docket, the court determined that although the parties had briefed a motion to dismiss, no such motion had ever been filed. In the interest of judicial economy and to keep the record straight, the court allowed the motion to dismiss to be entered *nunc pro tunc*.

2. Fed.R.Civ.P. 12 is incorporated into bankruptcy proceedings by Fed. R. Bankr.P. 7012.

3. 11 U.S.C. §§ 101–1330.

4. Unless stated otherwise, all statutory references are to the Code.

to sell its assets at public auction in open court. The assets were to be sold outside of the ordinary course of business and free and clear of all liens and encumbrances. The auction was to take place on December 1, 1999. Accompanying the sale motion was the bid of Dr. Norbert Gleicher. Dr. Gleicher was the Chairman of the Board of Gyncor and of both Debtor practices and thus is considered an insider. The relevant terms of the offer were: (i) a $3.5 million purchase price; (ii) a $25,000 deposit; (iii) $25,000 bidding increments at auction; and (iv) no financing contingencies. The court entered an order incorporating the terms of the offer and providing that any competing bid must be accompanied by a $25,000 deposit, be worth at least $25,000 more in cash to the Debtor, must be received by the Debtor and the court on or before November 26, 1999, and must be free of any financing contingencies. No competitive bids were received by the cut off date. On November 26, 1999, Dr. Gleicher informed the Debtor that he was unable to close under the previously agreed upon terms. The Debtor and Dr. Gleicher agreed to an amended sale agreement. The major change was a decrease in the purchase price to $2.7 million.[5] To effectuate the purchase of the assets, Dr. Gleicher formed two new medical corporations, American Infertility Group of New York ("AIG–NY") and American Infertility Group of Illinois ("AIG–IL") (collectively "Purchasers"). It appears that the Purchasers required financing to enable them to close. On December 1, 1999, Healthshield transmitted the Commitment to the Purchasers setting forth the terms and conditions on which it would loan funds to them in order to complete the purchase of the assets. On December 1, 1999, the court approved the sale of the Debtor's assets to the Purchasers. The sale was

scheduled to close on or before December 15, 1999.

On December 16, 1999, the Debtor filed a motion seeking emergency relief from this court because the sale transaction was not completed. In its motion the Debtor alleged that Healthshield (formerly CMI) had breached the Commitment to the Purchasers, which meant that the Purchasers were unable to close the purchase of the assets. Also contained in the motion were new terms for the sale of the assets. As part of the new agreement, Capital Healthcare Financing ("Capital"), the lender to the Debtor entities, agreed to finance, in part, the Purchasers' acquisition of the assets and the purchase price was increased to $3 million. The amended terms provided:

> (b) *Additional Consideration.* Any claim which Purchasers may have against CMI [Healthshield] for breach of its financing commitment to Purchasers shall be prosecuted jointly with the claims of Capital and Sellers [Debtor], and 50% of any net recovery (after payment of all attorneys' fees and other costs of litigation) on account of the Purchasers' claim shall be paid as additional consideration to Capital for Capital's new financing commitment and the other 50% of any such net recovery on the Purchasers' claim shall be applied against the Purchasers' then remaining obligation to Capital.[6]

On December 17, 1999, this court approved the amended sale purchase agreement.

However, the sale did not close on December 17, 1999, and the parties continued to negotiate the terms for the sale of the Debtor's assets. On January 4, 2000, the Debtor filed another motion to approve the sale of the assets to the Purchasers under

---

**5.** By motion of December 1, 1999, the Debtor notified the court that Dr. Gleicher was unable to close on his original offer of purchase and certain terms were altered.

**6.** This is not quite correct. Affidavits attached to the Debtor's response to the Motion to Dismiss state that it was intended that 50% of any recovery from Capital's and the Purchasers' claims against Healthshield would be applied against Capital's § 507(b) superpriority claim against the Debtor's estate.

new terms. On January 5, 2000, the court again entered another order approving the amended sale transaction. This order was the final order and the transaction closed with a purchase price of $3 million.

The Debtor's January 12, 2000, complaint was filed in response to a summons served upon AIG–NY, AIG–IL, and Capital for a lawsuit to be initiated in New York by Healthshield.[7] In the Complaint, the Debtor sought to forestall the New York litigation alleging that it violated the automatic stay of § 362 as an attempt to exert control over property of the estate. On January 18, 2000, with the consent of the parties, the court entered a standstill order which prevented any party from taking any action in either the New York or Illinois lawsuits. The standstill order was in effect at least until February 7, 2000, when this court had scheduled a hearing on the Debtor's motion, filed January 14, 2000, seeking a preliminary injunction. During the standstill period, Capital and Dr. Gleicher, AIG–IL, and AIG–NY filed motions to intervene as parties plaintiff in the Debtor's adversary against the Defendants. In the interest of judicial economy and to save costs for the parties, the parties agreed that intervention would be granted for the limited purpose of determining whether the court had subject matter jurisdiction over this adversary proceeding.[8] If the court finds it has jurisdiction, the intervention matter will then be before the court. If the court determines that it has no jurisdiction, the intervention matter will be moot. On February 11, 2000, Capital filed a complaint against Healthshield within the above captioned adversary proceeding.[9] Finally, on March 8, 2000, the court dissolved the previously enacted standstill agreement.

7. New York Civil Procedure allows a summons to be served without a complaint having been filed. N.Y. C.P.L.R. § 304; 22 NYCRR § 212.6. Healthshield filed the summons on December 20, 1999.

8. The order was entered *nunc pro tunc* March 16, 2000.

## DISCUSSION

In their motion to dismiss, the Defendants proffer three arguments. The first is that this court does not have subject matter jurisdiction over the complaint, thus it must be dismissed pursuant to Rule 12(b)(1). The second is that even if this court does have subject matter jurisdiction, that the complaint fails to state a cause of action upon which relief can be granted and therefore it must be dismissed pursuant to Rule 12(b)(6). Last, they argue that if this court does have jurisdiction and the complaint does state a cause of action, that this court should abstain and let the parties litigate in New York where the original summons was filed, albeit without a complaint. The court will not abstain from the proceedings. If jurisdiction does lie with this court, it will hear and adjudicate the issues presented. It is the court's position that the matter is either a core proceeding, meaning that the court has jurisdiction to enter a final order, or that it has no jurisdiction whatsoever. 28 U.S.C. § 157.

## SUBJECT MATTER JURISDICTION (Fed.R.Civ.P. 12(b)(1))

Motions to dismiss based upon Fed.R.Civ.P. 12(b)(1) are of two types. The first is based on the failure of the complaint to properly plead the court's jurisdiction. These motions are facial attacks and the court must accept the well pled allegations as true and draw all reasonable inferences therefrom. *Villasenor v. Industrial Wire & Cable, Inc.*, 929 F.Supp. 310 (N.D.Ill.1996). The second type is a factual attack on the court's subject matter jurisdiction; an allegation that subject matter jurisdiction does not

9. The complaint is a four count complaint seeking damages for breach of contract, promissory estoppel, equitable estoppel, and negligent misrepresentation. No action has been taken on this complaint to date.

lie with the court. When a court is presented with a motion of this type it "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Villasenor,* 929 F.Supp. at 312 *quoting Ezekiel v. Michel,* 66 F.3d 894, 897 (7th Cir.1995). The challenge asserted to this court's jurisdiction is of the second type, a factual attack, and the court can review the additional evidence submitted by the parties in support of their respective positions. *Id.*

■ It is a well established that parties cannot, by agreement, confer subject matter jurisdiction upon a court.[10] *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *Scaccianoce v. Hixon Mfg. & Supply Co.,* 57 F.3d 582 (7th Cir.1995). Nor can parties create jurisdiction by artifice, assignment, or collusion. 28 U.S.C. § 1359. A party cannot waive the subject matter jurisdiction requirement of the federal courts. *Levin v. Attorney Registration and Disciplinary Comm'n of the Supreme Court of Ill.,* 74 F.3d 763 (7th Cir.1996). Subject matter jurisdiction can be raised at any time in the proceeding and if not raised by the parties, can be raised *sua sponte* by the court. *Insurance Corp. of Ireland, Ltd.,* 456 U.S. at 702, 102 S.Ct. 2099 (1982); *Levin,* 74 F.3d at 766.

*Automatic Stay*

■ The court will first address whether it has subject matter jurisdiction over the Debtor's contention that the New York lawsuit violates the automatic stay imposed by § 362. Bankruptcy jurisdiction is found in 28 U.S.C. § 1334 which states, in relevant part,

---

**10.** The cases cited by the Plaintiffs which allude to a party consenting to subject matter jurisdiction are inapposite because each dealt with a party contracting with a debtor or trustee. A contract with either a debtor or trustee obviously grants subject matter jurisdiction to the bankruptcy court.

(a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

Section 1334 of Title 28 must be coupled with 28 U.S.C. § 157 for a determination of the bankruptcy court's full authority. It is 28 U.S.C. § 157 that allows the district courts to refer cases "arising under title 11 or arising in or related to a case under title 11" to the bankruptcy court.[11] 28 U.S.C. § 157(a). If 28 U.S.C. § 1334 provides jurisdiction and the matter is referred to the bankruptcy court, the court must determine whether the matter is a core proceeding or merely related to the bankruptcy. If it is a core proceeding the bankruptcy court has the authority to hear and determine the issues arising and "may enter appropriate orders and judgment." 28 U.S.C. § 157. However, if a matter falls under the "related to" jurisdiction, the bankruptcy court plays a more limited role. If all parties agree, the bankruptcy court has the authority to hear the issues and enter judgment as if it were a core proceeding. Otherwise, the bankruptcy court's authority is limited to hearing the proceeding and issuing findings of fact and conclusions of law for the district court's *de novo* review.

The Defendants argue that this court has no jurisdiction over the alleged violation of the automatic stay. They argue that no property of the bankruptcy estate

---

**11.** In the Northern District of Illinois bankruptcy proceedings have been referred to the bankruptcy court by Internal Operating Procedure 15(a).

is at issue. To bolster this allegation they point to the language of the emergency motion which states that 50% of any recovery would be paid to offset the Purchasers' obligation to Capital, not the Debtor's obligation to Capital. They also argue that any payment against Capital's superpriority claim on behalf of the Debtor is too speculative and remote to provide this court with subject matter jurisdiction.

The Debtor and the interveners each filed briefs in opposition to the motion to dismiss. Because each adopts the arguments proffered by the others, the court will reference them collectively as the arguments of the Plaintiffs. The Plaintiffs argue that any proceeding alleging a violation of the automatic stay is a core proceeding because it arises under title 11. They also argue that the Defendant's claim that there is no violation of the automatic stay is misguided and should not be taken into consideration when deciding whether subject matter jurisdiction lies with this court. Lastly, they offer two affidavits which they argue show that the language relied upon by the Defendants was in error and the emergency motion should have read that 50% of the recovery would go to offset Capital's § 507 claim against the bankruptcy estate.[12]

■ There can be no question that an alleged violation of the automatic stay is a matter "arising under" title 11. An adversary complaint arises under title 11 if it pleads a cause of action created or determined by the Code. *Long Beach Acceptance Corp. v. City of Chicago (In re T.J. Madison)*, 249 B.R. 751 (Bankr.N.D.Ill. 2000) (citations omitted).[13] By its very nature, an allegation that the automatic stay was violated must arise under title 11. 11 U.S.C. § 362. It is not relevant to the analysis of whether subject matter jurisdiction lies with the court that the allega-

tion may fail to state a claim upon which relief can be granted.

■ Because the allegation falls within the court's "arising under" jurisdiction, it must be determined whether the cause is a "core proceeding." Section 157(b)(2) sets forth a nonexclusive list of matters which are core proceedings. Section 157(b)(3) provides that the bankruptcy judge "shall determine ... whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." The determination is not to be based solely on whether the proceeding may be affected by state law. 28 U.S.C. § 157. The court determines that an alleged violation of the automatic stay is a core proceeding. *See Continental Air Lines, Inc. v. Hillblom (In re Continental Air Lines, Inc.)*, 61 B.R. 758, 764 n. 11 (S.D.Tex.1986). Because this matter is a core proceeding, the court has the authority to enter the appropriate order and judgment. 28 U.S.C. § 157.

*Injunction*

■ The court will next turn to whether it has subject matter jurisdiction over the injunction requested to stay the New York litigation. There are two ways suggested by the Plaintiffs that this court may have subject matter jurisdiction over the requested injunction. The first is by the reduction of Capital's § 507 superpriority claim against the Debtor's estate. This would occur because 50% of any net recovery by Capital and the Purchasers from a yet to be filed action against Healthshield would be applied to reduce Capital's § 507 superpriority claim without any payment by the Debtor. The second is if the Debtor is a third party beneficiary of the Commitment.

The Defendants argue, however, that this court does not have subject matter jurisdiction over this proceeding because

---

**12.** Capital has a superpriority claim against the Debtor for financing the Debtor's operations during the Chapter 11 proceedings. 11 U.S.C. § 507.

**13.** This case will be reported at 249 B.R. 751.

the New York lawsuit involves neither the Debtor nor property of the estate and the lawsuit is wholly independent of the bankruptcy court. They argue that merely stating that a portion of the Code is involved is not sufficient to grant subject matter jurisdiction. The Defendants continue that because the cause of action is a state law claim, breach of contract, that at most the court has "related to" jurisdiction.

Next they argue that this court does not possess related to jurisdiction either. The Defendants point to *Elscint v. First Wis. Fin. Corp. (In re Xonics, Inc.)*, 813 F.2d 127 (7th Cir.1987) for the proposition that this circuit uses a restrictive definition of "related to" jurisdiction and that this situation falls far outside of those boundaries. They argue that there can be no "material effect" on the bankruptcy estate or on amounts due creditors resulting from a lawsuit in a different forum between two non-debtors. The Defendants argue that the Debtor is neither a third party beneficiary of the original Commitment nor an assignee of the proceeds of the lawsuit which would grant this court subject matter jurisdiction. Because the outcome of the litigation is uncertain and there is no guarantee of any funds being paid to reduce Capital's § 507 claim, the Defendants argue that "related to" jurisdiction does not exist because the possibility of a positive outcome is tenuous.

The Plaintiffs obviously disagree with the assessments made by the Defendants and believe that the potential reduction of Capital's superpriority claim vests the Debtor with rights which are property of the estate under § 541 and that this court has subject matter jurisdiction. At the very least, the Plaintiffs contend, the Debtor is a third party beneficiary to the Commitment. They first argue that "related to" jurisdiction is broad enough to encompass this situation. They also argue that the Debtor was a third party beneficiary because Healthshield knew that at least a portion of the money to be lent to the Purchasers would be used to purchase the Debtor's assets and that Healthshield knew that the Debtor needed the court's approval prior to effectuating the sale of its assets.[14] They also refute the Defendant's argument that any recovery is purely speculative and that that alone is not enough to rob this court of jurisdiction. Any litigation comes part and parcel with attendant risks and costs, argue the Plaintiffs, and although no outcome is certain, this is not enough to take the jurisdiction from this court. Further, they argue, the Commitment specifically stated that it was subject to the Bankruptcy Court's approval of the sale of the Debtor's assets.[15] This alone, they argue, is sufficient to give this court jurisdiction over the proceeding.

*Application of 50% of the net recovery from Healthshield for the benefit of the Debtor*

The application of 50% of the net recovery of the proceeds of any recovery against Healthshield, as described above, cannot confer subject matter jurisdiction upon the court.[16] 28 U.S.C. § 1359. Section 1359 of Title 28 is very clear in its mandate: "a district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or

14. With this view of a commitment all prospective sellers of goods or services on credit would be third party beneficiaries to the transaction for which they have committed funds for working capital. A very doubtful result.

15. The money would not be required if the sale to the Purchasers was not consummated and a sale outside the ordinary course of a debtor's business must be approved by the bankruptcy court after proper and sufficient notice. Though the Commitment is sparse, this detail is certainly essential. One does not loan for a purpose and not put the purpose in the commitment. To infer that doing so makes the seller or vendor a party to the commitment makes no sense whatsoever.

16. At this time, the Plaintiffs have not filed suit in New York nor have they filed a counterclaim there.

joined to invoke the jurisdiction of the court."[17] 28 U.S.C. § 1359. "This court is concerned over the possibility that the jurisdiction of the bankruptcy court has been invoked to resolve a dispute between non-parties to a bankruptcy proceeding. (citation omitted.) The assignment appears to have no valid business purpose; its relationship to the bankruptcy proceedings is not clear." *In re Maislin Indus.,* 66 B.R. 614, 615 (E.D.Mich.1986). The facts of this case are similar to *Kramer v. Caribbean Mills, Inc.,* 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969), in which the Supreme Court determined that the assignment in question violated the statute and did not establish subject matter jurisdiction. In *Kramer,* the plaintiff purchased a cause of action for $1 in exchange for a promise to pay back 95% of any recovery. His purchase of the cause of action made the parties diverse and qualified the case for federal jurisdiction. "If federal jurisdiction could be created by assignments of this kind, which are easy to arrange and involve few disadvantages for the assignor, then a vast quantity of ordinary contract and tort litigation could be channeled into the federal courts at the will of one of the parties. Such 'manufacture of Federal jurisdiction' was the very thing which Congress intended to prevent when it enacted [28 U.S.C.] § 1359." *Kramer,* 394 U.S. at 828–29, 89 S.Ct. 1487. Also similar is *Harrell and Sumner Contracting Co., Inc. v. Peabody Petersen Co.,* 546 F.2d 1227 (5th Cir.1977), in which the court upheld the district court's determination that the assignment of one-half of the subject litigation in exchange for one-half of any recovery was a transaction which was lacking in economic substance, and found no subject matter jurisdiction. This case is no different than those cited above. The court does not gain subject matter jurisdiction based upon the reduction of the Debtor's obligation to Capital by appli-

cation of 50% of any net recovery from Healthshield under its to be alleged violation of the terms of the Commitment.

Further, "related to" jurisdiction is not applicable to the matter at issue. This case differs from *Xonics* because in *Xonics* the receivables at issue were, at one time, property of the bankruptcy estate and their apportionment had the possibility of affecting the payment to unsecured creditors, thus possibly providing "related to" jurisdiction. *Elscint v. First Wis. Fin. Corp. (In re Xonics, Inc.),* 813 F.2d 127 (7th Cir.1987). In this matter, the Commitment was never part of the Debtor's bankruptcy estate nor did the Debtor have any interest whatsoever in the Commitment at the time of its issuance. It follows that any right to recovery that the Purchasers and Capital have from Healthshield is not part of the Debtor's estate. This cause of action does not fall within *Xonics* and the court would never have held related to jurisdiction and cannot now take it by reason of the interest that the Debtor may have in the outcome of the New York litigation.[18]

*Third Party Beneficiary*

 The Debtor is not a third party beneficiary of the Commitment agreement between Healthshield and the Purchasers. Because loan commitments are contracts between lender and borrower basic contract principles apply. *Freeman Horn, Inc. v. Trustmark Nat'l Bank,* 245 B.R. 820 (S.D.Miss.1999). In Illinois, courts look to the intent of the contracting parties at the time the contract was entered into for a determination of whether a third party was an intended third party beneficiary. *Choi v. Chase Manhattan Mortgage Co.,* 63 F.Supp.2d 874 (N.D.Ill.1999) *citing Carson Pirie Scott & Co. v. Parrett,* 261 Ill.App. 200 (Ill.App.Ct.1931). Only when parties intend to enter into a contract for the direct benefit of a third party can that third party enforce rights arising

---

**17.** The court is not implying any nefarious action upon any of the parties to the transaction.

**18.** See *Elscint v. First Wis. Fin. Corp. (In re Xonics, Inc.),* 813 F.2d 127 (7th Cir.1987).

from the contract. *Fantino v. Lenders Title and Guaranty Co.*, 303 Ill.App.3d 204, 236 Ill.Dec. 629, 707 N.E.2d 756 (1999) *citing People ex rel. Skinner v. Graham*, 170 Ill.App.3d 417, 120 Ill.Dec. 612, 524 N.E.2d 642 (1988). In order for a party to enforce rights as a third party beneficiary, the party must show that the benefit was a direct, not incidental benefit. *Dale v. Groebe & Co.*, 103 Ill.App.3d 649, 59 Ill. Dec. 350, 431 N.E.2d 1107 (1981). In Illinois, there is a strong presumption that parties are contracting on their own behalf and not for the benefit of others. Any benefit for a third party, without more, is seen as incidental. "To overcome that presumption, the implication must be so strong as to be practically an express declaration." *Choi v. Chase Manhattan Mortgage Co.*, 63 F.Supp.2d 874, 881 (N.D.Ill.1999).

A review of the Commitment and relevant facts leads the court to the inescapable conclusion that the Debtor was not a third party beneficiary to the contract. The Commitment does not meet the criteria to find the Debtor a third party beneficiary; it was not identified in the Commitment nor is it obvious that the Debtor was intended to benefit from the Commitment other than incidentally. There can be no question that Healthshield and the purchasing entities knew that the Debtor was to be the ultimate recipient of a portion of the funds, but this does not suffice to make the Debtor a third party beneficiary. *See Choi v. Chase Manhattan Mortgage Co.*, 63 F.Supp.2d 874 (N.D.Ill.1999); *Fantino v. Lenders Title and Guaranty Co.*, 303 Ill.App.3d 204, 236 Ill.Dec. 629, 707 N.E.2d 756 (1999); *Dale v. Groebe & Co.*, 103 Ill.App.3d 649, 59 Ill.Dec. 350, 431 N.E.2d 1107 (1981). This case is similar to the *Dale* case in which the court found that the third party was not the intended beneficiary of a lending commitment. *Dale v. Groebe & Co.*, 103 Ill.App.3d 649, 59 Ill. Dec. 350, 431 N.E.2d 1107 (1981). In *Dale* the purported third party beneficiary had a stronger case than the Debtor; it called the lending institution to verify the commitment and that funding would be forthcoming. Further, although the Commitment said that the funding of the loan was subject to the court's approval of the sale agreement, that does not confer subject matter jurisdiction over the Commitment on the court. The court's approval was merely a condition precedent to the funds being advanced. Without court approval there could have been no sale, thus no need for the funds. It should be remembered that the terms of the sale agreement as well as the court's order recite that the sale was not contingent upon financing. It is now disingenuous for the Debtor to argue that it was a third party beneficiary to the Commitment.

The Debtor had a possible alternative by which it might have procured subject matter jurisdiction in this court. It could have provided that it be a party to any commitment. Although this would have, in all likelihood, cost the intended purchasers more money, reduced the number of lenders willing to lend money to the intended purchasers, and clearly made competitive bidding impossible, it might have given this court subject matter jurisdiction over that part of the transaction. In all likelihood this procedure would not be followed. In sixteen years on the bankruptcy bench the court recalls no such provision in any auction sale.

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The Defendants also ask that if this court does find jurisdiction that it dismiss the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Because the court finds it has jurisdiction over the alleged violation of the automatic stay, it will address the allegation that the Complaint fails to state a cause of action upon which relief can be granted.

Dismissal is only appropriate when the plaintiff can prove no set of facts to support the claims asserted. *Conley v. Gib-*

*son,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court must accept all well pled allegations as true and interpret all ambiguities in favor of the plaintiff. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Curtis v. Bembenek,* 48 F.3d 281 (7th Cir.1995). A complaint must include either direct or inferential allegations for each material element of the claim asserted. *Howard v. Local 152 of the Int'l Constr. Union of Am.,* 999 F.Supp. 1213, 1215 (N.D.Ill.1998). Conclusory allegations unsupported by facts will not withstand a motion to dismiss. *Lexington Health Care Center of Chicago Ridge, Inc. v. Kraye (In re Kraye),* No. 98 B 02693, 98 A 00841, 1998 WL 775654 (Bankr.N.D.Ill. Nov. 6, 1998). If after accepting the well-pleaded allegations and drawing all reasonable inferences, the plaintiff fails to state a claim upon which relief can be granted, the court must dismiss the complaint. *Love v. City of Chicago,* 5 F.Supp.2d 611 (N.D.Ill.1998).

■ Section 362(a)(3) provides that "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate is prohibited" once a party files for bankruptcy protection. 11 U.S.C. § 362(a)(3). The Debtor argues that pursuant to § 541 any award recovered by Capital or the Purchasers and used to offset Capital's superpriority claim against the Debtor's estate would be after acquired property and is therefore part of its estate. In this case the Debtor has no control over the lawsuit because any cause of action under the Commitment is not the Debtor's to pursue. The estate's benefit is wholly dependent upon Capital and the Purchasers. Because the bankruptcy estate does not have an interest in the Commitment, it has no ownership of the cause of action against Healthshield under the Commitment and it can not be said that the cause of action for a breach of the Commitment is part of the bankruptcy es-

tate. Therefore there can be no violation of the automatic stay.

Although the definition of property for purposes of the Code is broad, and encompasses all kinds of property, including tangible and intangible property, choses in action, and causes of action, subsection 362(a)(3) does not bar every proceeding hostile to a debtor's claimed interest in property, no matter how intangible, unmatured or unliquidated the debtor's claim, and no matter how indirect the attack upon the estate's interest in property. The commencement of proceedings based upon a post-petition cause of action against the debtor is generally not encompassed by subsection 362(a)(3), even when a substantial claim adverse to the debtor's claimed interest in property is asserted which might ultimately establish that the estate has no legal or equitable interest in the claimed property. *Continental Air Lines, Inc. v. Hillblom (In re Continental Air Lines, Inc.),* 61 B.R. 758, 778 (S.D.Tex.1986)

■ The reduction in Capital's superpriority claim, in the event of a recovery, does not make the cause of action giving rise to that possibility property of the Debtor's estate. Moreover, post-petition claims are not generally subject to the automatic stay. *Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods, Inc.),* 186 B.R. 414 at 436 n. 17 (N.D.Ill.1995) *citing Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 996 (5th Cir.1985).

Because any cause of action arising by reason of the Commitment is not property of the estate, the Motion to dismiss the alleged violations of the automatic stay (§ 362) will be granted.

For the reasons set forth above, the Defendant's Motion to dismiss the Complaint will be granted and judgment entered for the Defendants.

APPENDIX A

*CMI Capital*

December 1, 1999

BY TELECOPIER

Neal Gerber & Eisenberg
Two North LaSalle Street
Chicago, Illinois 60602
Attn.: Mr. Tim French

RE: Loan Commitments in Favor of American Infertility Group of Illinois, S.C. and American Infertility Group of New York, P.C.

Dear Tim;

This will confirm the funding commitments that CMI Capital (Lender) has extended to American Infertility Group of Illinois, S.C. (AIG-IL) and American Infertility Group of New York, P.C . (AIG-NY). The terms of these commitments, are subject to the following contingencies, which must be met prior to funding: (1) CMI's receipt of executed physician contracts for AIG-IL from Dr's. Gleicher and Karande (2) The subordination agreements of Dr.'s. Gleicher and Karande subordinating their salaries and perquisites to all other expenses, inclusive but not limited to interest and principle payments on outstanding CMI Capital loans (3) AIG-IL acknowledges that upon closing of the Account Purchase Facility, any funds received under the Subcontracting Agreement for Comprehensive Infertility Care Service between Gyncor, Inc. and AIG-IL shall flow through the Lock Box established for the benefit of CMI Capital Corporation. These commitments are also subject to the Bankruptcy Court's approval of the sale of the assets to AIG-IL and AIG-NY as set forth in that certain Asset Purchase Agreement dated as of November 30, 1999, are set forth below.

I. **Commitments in Favor of AIG-IL**

a. **Accounts Purchase Facility**

Borrower: AIG-IL

Maximum Aggregate $3,000,000 to be disbursed on a purchase basis.
Purchase Facility:

Initial Advance: $1,300,000 to be funded at the time of the closing of AIG-IL's purchase of the assets of Gyncor, Inc. and the Center for Human Reproduction-Illinois (Closing), as set forth in that certain Asset Purchase Agreement dated as of November 30, 1999 (Asset Purchase Agreement). Thereafter, additional advances based upon Eligible A/R's,

*15 South Bayles Avenue*
*Port Washington, NY 11050*
*Telephone 516.944.4500*
*Facsimile 516.944.4519*

up to but not exceeding the Maximum Aggregate Purchase Facility will be made on a weekly basis.

**Use of Proceeds:** To provide capital to complete the asset purchase under the Asset Purchase Agreement, and to provide working capital for AIG-IL.

**Eligible A/R's:** Accounts receivable acquired or generated by AIG-IL that are free and clear of any and all liens, security interests, adverse claims or other encumbrances that would prevent Lender from obtaining clear title in and to such Receivables.

**Advance rate:** Subsequent to the Initial Advance, Lender will advance to AIG-IL and amount up to 85% of the Eligible A/R's.

**Collateral:** Lender will file a blanket lien on all of AIG-IL's receivables.

**Repurchase Date:** 180 days from Billing Date.

**Cost of Funds:** Lender will charge a discount of 4% on the Initial Advance (Purchase). On subsequent advances all purchases will be made at a 3% discount.

**Origination Fee:** 2% of the Aggregate Purchase facility payable at Closing.

**Servicing Fee:** AIG-IL will pay a one time set-up fee of $2,000 at the Closing and .001666% per month (2% per annum) on the average outstanding purchase amount for servicing the account.

**Pre-Payment Penalty:** 2% of the total Aggregate Purchase Facility in Year One
1% of the total Aggregate Purchase Facility in Year Two

**Closing Date:** The Closing and fundings under the Account Purchase Facility will occur as soon as possible, but in no event later than December 15, 1999.

**Program Term:** (2) Years

**2. Commitments in Favor of AIG-NY**

**a. Accounts Purchase Facility**

Borrower: AIG-NY

Maximum Aggregate $1,500,000 to be disbursed on a purchase basis
Purchase Facility:

Initial Advance: $550,000 to be funded at the time of the closing of AIG-NY's purchase of the assets of Gyncor, Inc. and the Center for Human Reproduction-New York (Closing), as set forth in that certain Asset Purchase Agreement dated as of November 30, 1999 (Asset Purchase Agreement). Thereafter, additional advances based upon Eligible A/R's, up tp but not exceeding the Maximum Aggregate Purchase Facility will be made on a weekly basis.

Use of Proceeds: To provide capital to complete the asset purchase under the Asset Purchase Agreement, and to provide working capital for AIG-NY.

Eligible A/R's: Accounts receivable acquired or generated by AIG-NY that are free and clear of any and all liens, security interests, adverse claims or other encumbrances that would prevent Lender from obtaining clear title in and to such Receivables.

Advance rate: Subsequent to the Initial Advance, Lender will advance to AIG-NY and amount up to 85% of the Eligible A/R's.

Collateral: Lender will file a blanket lien on all of AIG-NY's receivables.

Repurchase Date: 180 days from Billing Date.

Cost of Funds: Lender will charge a discount of 4% on the Initial Advance (Purchase). On subsequent advances all purchases will be made at a 3% discount.

Origination Fee: 2% of the Aggregate Purchase facility payable at Closing.

Servicing Fee: AIG-NY will pay a one time set-up fee of $2,000 at the Closing and .001666% per month (2% per annum) on the average outstanding purchase amount for servicing the account.

| | |
|---|---|
| Pre-Payment Penalty: | 2% of the total Aggregate Purchase Facility in Year One<br>1% of the total Aggregate Purchase Facility in Year Two |
| Closing Date: | The Closing and fundings under the Account Purchase Facility will occur as soon as possible, but in no event later than December 15, 1999. |
| Program Term: | (2) Years |

This document represents a firm commitment on the part of CMI Capital Corporation to provide Accounts Receivable financing to both AIG-IL and AIG-NY in the amounts and under the terms listed above upon the approval of the Bankruptcy Court for the Northern District of Illinois, and the satisfaction of the contingency terms as stated.